**United States District Court**
**District of Connecticut**

**Michael Picard**,
*Plaintiff*

*v.*

**Jonathan Fontneau**, *et al.*
*Defendants*

No. 3:19-cv-0511 RNC
September 5, 2020

**Opposition to Defendants' Motion For Summary Judgment**

The fact record in this police misconduct litigation reveals the existence of a concerted effort by the defendants to frame the Plaintiff, Michael Picard, for a crime he did not commit after the Plaintiff appeared and peacefully protested on the sidewalk in front of their organization's headquarters on April 26, 2018. The evidence tells that after the defendants became aware of the Plaintiff's protest they reported it to the local prosecutor, Richard Colangelo, who advised what conduct would have to be "documented" in order that the Plaintiff could be "lawfully" charged. After taking this advise from the prosecutor, the defendants arrested the Plaintiff, accusing him of a crime he did not commit.

Defendant Bretthauer was the first to notice the Plaintiff's protest and she stood by and observed the Plaintiff and reported his presence and conduct up the chain of command to defendant (then police chief) Fontneau. Defendant McGowan arrived at the station just after Bretthauer and stood by with Bretthauer watching the Plaintiff's protest, eventually dictating the police report of the incident to a lower-ranking police officer who he ordered to write it, telling that officer which allegations to include. Defendant Fontneau confronted the Plaintiff and issued him an unreasonable and unlawful ultimatum to either *take down his sign or be arrested*. Fontneau then ordered the Plaintiff's arrest, which Bretthauer performed. The Plaintiff's sign, which he had been

peaceably displaying on the sidewalk was confiscated from him as well as certain other of his valuable non-contraband belongings and a police report containing fabricated allegations[1] was created by order of McGowan, by another officer who did not witness any part of the event. McGowan signed off on the report as supervisor, despite the fact that the report contained allegations he had in fact recited to the officer who wrote it. The Plaintiff alleges that all this was an attempt to railroad the him into an unwarranted criminal court proceeding as punishment for his protesting the defendant's law enforcement agency.

The criminal proceedings against the Plaintiff were dropped by the state on July 5, 2018 at the third hearing[2] in the Stamford criminal court when the prosecutor's office decided that the allegations in the police report could not be substantiated[3] and despite claiming never to have *personally* viewed the video captured on the Plaintiff's body-worn camera, it is evident that that office did in fact obtain it from the Stamford Police ahead of the July 5, 2018 court date[4] whereat the prosecutor offered to nolle the charges at the July 5, 2018 court date, the Plaintiff's lawyer moved instead for a dismissal, and the court granted it absent objection from the state's attorney thus concluding the criminal action in the Plaintiff's favor[5].

The defendants expected the Plaintiff to suffer through the criminal court process based on zero evidence except for their words. Words which the Plaintiff's video prove to have been lies. The evidence suggests those lies to have been offered up for the malicious purpose of meeting out some "street level justice" to the Plaintiff who had

---

1   See Exhibit 10. These allegation include that Mr. Picard was "jumping out in front of people" on the sidewalk and are contradicted entirely by both the video that Mr. Picard recorded with his body-worn camera (Exhibit 1 to this motion), and that of his friend David Ortiz, who live-streamed the protest (Exhibit 2 to this motion).
2   See Exhibits 12-14.
3   *See Colangelo Deposition Exhibit 9 at 24:18-20.*
4   See Exhibit 7.
5   See Exhibit 14.

violated no law, except the unwritten one: contempt of cop. Nevertheless the defendants contend [ECF No. 64] that they cannot be held responsible for their actions. They are wrong and their motion(s) must be denied.

On a motion for summary judgment, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Estate of Gustafson ex rel. Reginella v. Target Corp.*, 819 F.3d 673, 675 (2d Cir. 2016) (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)). Summary judgment is appropriate only if the pleadings, the discovery and the disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## 1. Neither retaliation, nor time, place or manner restrictions, nor narrow tailoring are doctrines that garner judgment for the defendants.

The defendants' motion devotes substantial space to concepts irrelevant to this litigation, particularly retaliation; time, place, and manner restrictions; and the Fourth Amendment standards for arrest. None of these concepts have bearing on Mr. Picard's counts against any of the defendants.

## 1.1 The physical seizure, sign-confiscation, arrest and fabrication of allegations against Picard to stop his speech were direct First Amendment violations rather than instances of retaliation.

Mr. Picard stood on a sidewalk that passes the public entrance to the (now former) Stamford Police headquarters on Bedford Street in Stamford, displaying a sign reading "Fuck Free Speech – Stamford PD[6]." The message Mr. Picard meant to convey

---

6   See Exhibit 1, Picard's video created with his body worn camera, and Exhibit 2, a video created by witness Ortiz.

with this sign was that the Stamford Police Department had no respect for the First Amendment rights of civilians who disagree with their actions or policies, Mr. Picard having drawn this conclusion based on the arrest, some days prior, of Michael Friend, who was arrested for holding a "Cops Ahead" sign ahead of a cellphone sting checkpoint[7]. By that arrest Mr. Picard saw the Stamford Police as not honoring the First Amendment rights of the local citizenry hence the attributing of "Fuck Free Speech" by the "- Stamford PD" portion of his sign. Mr. Picard pleaded all his speech restriction counts as direct First Amendment violations but in their motion for summary judgment the defendants seem to address them as First Amendment retaliation claims, which they are not.

In direct First Amendment claims the plaintiff alleges that the defendant's actions are the immediate, direct cause of a speech prohibition. These claims range from a government employee destroying a sign, to a legislative body enacting a measure forbidding certain speech. *See generally Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 31-32 (2d Cir. 1996) (distinguishing "affirmative First Amendment claims" from First Amendment retaliation claims). Direct First Amendment claims require no proof that the defendant acted with any purpose to squelch speech, because the cause and effect between the challenged government action and resulting silencing are shoulder-to-shoulder. "In other words, the government may violate the speech clause even if it acts without the purpose of curtailing speech. Free speech claims do not require specific intent." *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1074 (9th Cir. 2012). *See also Minneapolis Star & Tribune v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983) ("[E]ven regulations

---

7   See Picard Deposition Exhibit 5 at 72:25 through 73:3 and Exhibit 3 Stamford Advocate Article about the arrest.

4

aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.").

First Amendment retaliation claims, by contrast, use intent to bridge a gap between cause (protected speech) and effect (adverse action). Generally, the adverse action against a retaliation plaintiff comes later in time from the protected speech, is levied as a punishment for the past speech, and often would not by itself violate the First Amendment.[8] The career civil servant fired for her political affiliation, for instance, cannot point to the First Amendment as the guarantor of government employment or due process in termination. Nor can the applicant for welfare benefits denied them on the basis of her opinions cite the First Amendment as providing a right to public assistance. Instead, by alleging First Amendment retaliation, such a person alleges that cause and later effect should be considered linked together, such that the government agency has "by withdrawal of . . . privileges" placed "limitations upon the freedom of speech which *if directly attempted* would be unconstitutional." *Speiser v. Randall*, 357 U.S. 513, 514 (1958) (emphasis added). Here, Mr. Picard has alleged, and can prove, that the defendants "directly attempted," to forbid his speech in several ways: by

---

8   *See, e.g., Brandon v. Kinter*, 938 F.3d 21, 41 (2d Cir. 2019) (defendant prison employees altered plaintiff's medically necessary diet a month after he filed meal-related grievances); *Ragbir v. Homan*, 923 F.3d 53, 59-60 (2d Cir. 2019) (ICE summarily detained and scheduled expedited removal for plaintiff ten months after he appeared at scheduled check-in with elected officials and attempted to confront field office deputy director, resulting in news coverage); *Gorman v. Rensselaer County*, 910 F.3d 40, 44 (2d Cir. 2018) (plaintiff subjected to months-long workplace harassment after reporting to prosecutors that a co-worker had unlawfully run personal searches in criminal history database); *Colvin v. Keen*, 900 F.3d 63, 66 (2d Cir. 2018) (reprimand and eventual refusal of reappointment a month after encounter with campus police); *Berg v. Kelly*, 897 F.3d 99, 103-04 (2d Cir. 2018) (night-long detention of protesters about an hour after congregating in an area reserved for the press); *Tanvir v. Tanzin*, 894 F.3d 449, 455 (2d Cir. 2018) (placement on "no-fly" list after refusing to become confidential informant for FBI); *Montero v. City of Yonkers*, 890 F.3d 386, 391-92 (2d Cir. 2018) (disciplinary investigation of plaintiff about a month after he publicly called for a no-confidence vote on the police commissioner); *Burns v. Martuscello*, 890 F.3d 77, 82-83 (2d Cir. 2018) (initiation of transfer to indefinite protective custody a month after refusing prison employees' demand that plaintiff begin informing on other prisoners).

5

initiating a police action by reporting the Plaintiff's completely lawful actions up the chain of command including making-up allegations against him in order to convince the decision maker to act upon him, by seizing his sign, by seizing him, and by issuing an ultimatum that he stop protesting or face arrest, the defendants violated the Plaintiff's First Amendment rights. Retaliation has no part in the analysis of Mr. Picard's claims.

## 1.2. The time, place, and manner doctrine is inapplicable to the speech restrictions inflicted on Mr. Picard.

At various points the defendants confusingly refer to the decision to stop Mr. Picard from speaking as a defensible neutral time, place, or manner restriction. It was not: content-neutral speech restrictions are ones that apply regardless of the speaker's message. Fontneau's ultimatum, and his statements to the Stamford Advocate afterwards prove that he stopped Mr. Picard speaking because he disfavored the message Picard was airing[9].

The sidewalk on which Picard stood was a public forum which served as a pathway to the entrance to the *public* entrance to the police department building, but which also serves as a pedestrian through-way from Hoyt Street and Southerly down Bedford Street. There are no signs, gates or other structures that suggest that the sidewalk is in any way *not* public[10], and in fact at least one of the police officers suggested in his deposition that a man walked past Picard on this sidewalk from the Hoyt Street direction and South right past the police station without stopping to visit the police station. There is no statute or ordinance restricting the use of the sidewalk to only non-expressive activity. It is undisputed that defendant Fontneau contacted the local prosecutor to discuss how to charge a man out in front of the police station holding a

---

9   See Exhibit 3.
10  See Picard's video body-worn camera footage: Exhibit 1; and Ortiz's live-streamed video footage: Exhibit 2.

sign that read "Fuck The Stamford Police" but as to what exactly he told the prosecutor is anything but undisputed, as neither Colangelo nor Fontneau seem to have a clear memory of it.[11] Yet, the defendants want to argue the case as if the Plaintiff seeks invalidation to some anti-protesting ordinance. This is a red herring by the defendants. Because the sidewalk, except for the fact that it happened to pass by the front of the police station, was indistinguishable from *any other* municipal sidewalk in the City of Stamford, Cases like *United States v. Kokinda*, 497 U.S. 720 (1990), *Make the Road by Walking v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004), designate the sidewalk in question as a place in which "[s]peech finds its greatest protection." *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (internal quotation omitted). In public fora, the government may only restrict speech via time, place, or manner restrictions if such restrictions are content-neutral. *E.g., Kass v. City of New York*, 864 F.3d 200, 208 (2d Cir. 2017). "Speech regulation is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2222 (2015).

Fontneau told Stamford Advocate reporter John Nickerson that he didn't like Mr. Picard's sign and apparently offered no other reason for having confiscated it and arresting Mr. Picard[12]. Defendant Fontneau's actions were the definition of content-based: had Picard displayed a sign with a different message, or no sign at all, Fontneau would not have stopped his speech. Authority dealing with content-neutral restrictions is irrelevant here; instead, the defendants bear the burden, *e.g., Green Party of Conn. v. Garfield*, 616 F.3d 189, 208 (2d Cir. 2010), of proving that silencing Mr. Picard served a compelling government interest and (2) was narrowly tailored to accomplish that

---

11 See Plaintiff's statement of additional facts #3 and attendant evidentiary basis.
12 See Exhibit 3 Stamford Advocate Article, "Arrest outside Stamford police station raises free-speech questions" dated April 27, 2018.

interest. *E.g., United States v. Caronia*, 703 F.3d 149, 163 (2d Cir. 2012). In any case, any argument that the defendants raise that their apprehension of the Plaintiff was content neutral and based on probable fail, because there was no probable cause. Faced with the dilemma of a video that refutes allegations that the Plaintiff was engaged in hassling-type activity (however phrased or worded) they drop back and punt and instead claim his arrest was based on his mere blocking the way by carrying his sandwich board on a sidewalk. If the defendants argument is that holding a cardboard sign on a sidewalk is probable cause to arrest someone under CGS §53(a)-181 (breach of peace in the second degree[13]) then why did they feel they needed to support the arrest with phone claims that he was "jumping out in front of people"[14] and in suggesting that its enough to have arrested the Plaintiff based merely on that his cardboard sign could have caused some people to have veered wide around him slightly while passing him on the sidewalk, then panhandling, restaurants advertising lunch specials on sidewalk, dog walking, stroller pushing and walking while very obese are *also* outlawed under §53(a)-181 because *all of those* activities cause folks to deviate slightly while sharing sidewalk space in the normal course of civilized life.

The "probable cause" defense also presents another issue for the defendants and that is that the statute requires the activity leading to the charge to have been conducted in a public space, and defines a public space as "any area that is used or held out for use by the public whether owned or operated by public or private interests"

---

13 CGS §53(a)-181, "breach of peace in the second degree" reads: (a) A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do. For purposes of this section, "public place" means any area that is used or held out for use by the public whether owned or operated by public or private interests.
14 See police report attached Exhibit 10.

8

and yet simultaneously they claim he was not in a public space. He *was* ordered to take down his sign or face arrest. So, if he was harassing pedestrians, all he had to do was put the sign down and then he would have been free to keep harassing them? Is that the defendant's argument? The facts show and it is plain to see that the Plaintiff was arrested for being offensive to the police. His sign read: "Fuck Free Speech -Stamford PD" which words are plainly a critical assault upon the Stamford Police Department.

### 1.3. Forbidding speech in an entire city in order to punish sidewalk hogs is not narrowly tailored police action.

Defendants mention in passing that arresting Mr. Picard merely for holding a sign on a "narrow" sidewalk was narrowly tailored. Though time, place and manner arguments have already been shown in this memorandum to be inapplicable, if the defendants had a prospective defense in that punishing the holding of cardboard signs on "narrow" sidewalks to prevent the very minor inconvenience of having to give the sign holder a wide berth is neither reasonable, narrowly tailored, nor practical. The defendants do not even seem to be able to accept that Mr. Picard was even *on* a sidewalk, instead insisting on calling the structure a "walkway" probably because admitting it to be a sidewalk would cut short the defendants' argument that Mr. Picard was not in a public forum (again, not that it matters). What qualifies as a "narrow" sidewalk? The defendants offer no evidence whatsoever that the sidewalk in question was in fact "narrow" or any "narrower" than any other sidewalk. And the fact that it also abutted a wide public parking area allowing pedestrians to pass one another even when conditions become crowded matters for purposes of determining just how intrusive a man holding a sandwich board disrupted foot travel. These are questions remaining for a jury to decide.

If the defendants wished to reduce Mr. Picard's disruption to foot traffic on the sidewalk the least-speech-restricting manner of doing so would be to tell him to stop doing it. Yet they did not. Consider defendant Fontneau's ultimatum: whatever actions Fontneau believed Picard to have engaged in up to the point he confronted him, Fontneau found it reasonable to offer Mr. Picard a chance to avoid arrest. Wouldn't it also have made sense to *tailor* that ultimatum to the part of Mr. Picard's conduct that brought him outside the boundaries of legal conduct? Wouldn't it have made more sense -ie been more *reasonable*- to tell Mr. Picard to stop jumping out in front of people, tone it down or simply to take his protest elsewhere? Fontneau's ultimatum cannot be walked back no matter how hard his co-defendants or anyone else tries. Punishing Mr. Picard for taking up too much sidewalk space is not a narrowly tailored method of keeping the peace and its a shallow attempt to shade the defendant officer's conduct as reasonable.

**2. Case law unequivocally forbids the punishment of Mr. Picard's peaceable sign-holding as an instance of creation of a public disturbance.**

As previously noted in this filing the defendants did not arrest Mr. Picard for violation of a statute or ordinance outlawing sign holding, or protesting *per se* nor did they site the public display of the word "fuck" as was done in the landmark "fuck the draft" case of *Cohen v. California*, 403 U.S. 15 (1971) but rather they framed it as a violation of Connecticut's "breach of peace" statute CGS §53(a)-181 by claiming he engaged in conduct that never occurred. However dressed up, the defendants' ultimate argument is that Mr. Picard's sign-holding could be punished through *that* state statute, even when Picard was peacefully standong on a public sidewalk. Decisions of the federal and Connecticut courts long ago decided that question against the defendants.

The most notorious manner in which police in Connecticut have curtail protected speech has been to re-frame non-violative conduct as "interfering with a police officer" using § 53a-167a, the state's "interfering with police" statute; a practice addressed in 1987 by the Connecticut Supreme Court which found the construction of the statute as unequivocal: the statute "excludes situations in which a defendant merely questions a police officer's authority or protests his or her action." *State v. Williams*, 534 A.2d 230, 238 (Conn. 1987). Rather, it "proscribe[s] only physical conduct and fighting words that by their very utterance inflict injury or tend to incite an immediate breach of the peace." Though dressed as a breach of peace, rather than an interference with police, Picard's case warrants a similar skepticism of the police narrative given the facts presented.

The incontrovertible meaning of *Williams* is that peaceably displaying a protest sign does not violate the interference statute. *See also Anderson v. City of New York*, 817 F.Supp.2d 77, 96 (E.D.N.Y. 2011) ("[P]rovocative speech directed at police officers is protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."). A similar judicial lens applies to the case at hand.

The defendants suggest that Picard's mere standing on a sidewalk holding a cardboard sign justified the arrest. That is wrong because defendant Fontneau's order to *take down his sign or be arrested* was to silence Picard's constitutionally protected speech, therefore it could not be "lawful." *See Williams*, 534 A.2d at 239. Fontneau specifically and solely acted to stop Mr. Picard's protected speech.

The defendants arguments that simply holding a sign is a violation of Connecticut's breach of peace statute because it may cause some folks to veer slightly

in their path of travel are without merit. There is no serious argument that Mr. Picard's protest simply comprised of standing on the sidewalk holding a sign -even if he did turn from side to side as to "point" his sign in the direction of oncoming pedestrians as without doing so none would be able to read the sign. "The expressive component" of Mr. Picard's protest was "not created by the conduct itself, but by the speech that accompanie[d] it," in the form of the words on his sign. *Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47, 66 (2006). *See, e.g., Marcavage*, 689 F.3d at 102, 104 (holding that plaintiffs "holding anti-abortion signs" on a sidewalk were engaged in speech that was "entitled to the fullest possible measure of constitutional protection").

At any rate, speech restrictions masquerading as conduct-only regulations can escape First Amendment scrutiny only if a violation of the regulation can be made out "wholly without reference to the words" used by the alleged violator. Fontneu's ultimatum precludes any such finding. The defendants simply cannot condition an arrest on whether someone acquiesces to an order to cease expressing his opinion -nor can they stand and take no action while a fellow officer does so. To do this then cling to the argument that the speech itself had nothing to do with the arrest is outrageous. It had EVERYTHING to do with the arrest. *Mr. Picard would not have been arrested had he taken down his sign*. *Expressions Hair Design v. Schneiderman*, 808 F.3d 118, 131 (2d Cir. 2015), overruled on other grounds, 137 S. Ct. 1144 (2017). Here, there is no dispute that Fontneau objected to the words on Mr. Picard's sign and not his mere presence on a public sidewalk.

**3. Defendants are not entitled to judgment on Mr. Picard's malicious prosecution count because there was not probable cause to arrest him, Fontneau *did* act with malice despite there being no such requirement to prove it, and there were post arraignment liberty restraints sufficient to implicate a fourth amendment violation.**

As to the malicious prosecution claims pleaded in the amended complaint, defendants contends that they are not liable because there was probable cause for the arrest -in fact for the charge given- that defendant Fontneau (or for that matter any other defendant) acted without malice, and that there is no post-arrest liberty restraint sufficient to implicate a Fourth Amendment violation. There is no merit to any of these arguments.

First, there was no probable cause to arrest him. Obviously, the defendants could not think of any good charge to give Mr. Picard based on what they were seeing, but wanted to charge him with something, necessitating a call to the prosecutor for some pointers. This alone indicates malice. That the defendants took the extraordinary step to fabricate allegations of conduct that never occurred is further evidence of a plan and intention to punish an innocent person.

There may be limited *direct* evidence of a malicious intent on the part of the defendants, however, direct evidence of malice is not required in order for the Plaintiff to survive summary judgment because "[c]ircumstantial evidence is generally sufficient to prove intent", *Dufort v. City of New York*, 874 F.3d 338, 354 (2017) and because "[m]alice may be proved inferentially because it is a matter of the defendant's subjective mental state, revolves around facts usually within the defendant's knowledge and control, and rarely is admitted." *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000). Plaintiff points again to the defendant Fontneau's conduct during the arrest as captured on the video. His ultimatum is clear, indicating his interest was in silencing the Plaintiff, and not in any legitimate police function. His statements to the press that he "found the sign to be offensive in front of police headquarters" and "[didn't] think our day-to-day residents should have to put up with something like that[15]"

---

15  See Exhibit 3

further provide inferential evidence of Fontneau's malice. "Malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff,' *Pinsky v. Duncan,* 79 F.3d 306, 313 (2d Cir.1996).

As to Mr. Picard's post-arraignment liberty restraints, he was arraigned in the state superior court in Stamford on May 10, 2018 and ordered to returned to court on May 10, 2018 when his case appeared on the regular docket and he argued for the return of his property, he was then ordered to appear again on July 5, 2018 when his case appeared on the pre-trial docket and the charge against his was dismissed. On each of these dates Mr. Picard was anything but free. He was not free to return to the police department to continue his protest under threat of arrest, was not free to skip court upon threat or re-arrest for failure to appear[16], and as such was also absolutely NOT free to go about his regular business, work, stay at home and relax, improve his mind with study or go out and protest. And although his charges were finally dropped on July 5, 2018, it was another twenty-two days before the Stamford Police finally called to tell him to come and pick up his things by which time he was deprived of his belongings, without probable cause, for 99 days. Mr. Picard lives in South Windsor. In order to retrievehis belongings he was forced to forfeit another day of his freedom to drive back and forth to Stamford to retrieve his belongings. Each trip to Stamford, for court or to pick up his belongings from the Stamford police station, is a round-trip drive of 170

---

16  **CGS 53a-173. Failure to appear in the second degree: Class A misdemeanor.** (a) A person is guilty of failure to appear in the second degree when (1) while charged with the commission of a misdemeanor or a motor vehicle violation for which a sentence to a term of imprisonment may be imposed and while out on bail or released under other procedure of law, such person willfully fails to appear when legally called according to the terms of such person's bail bond or promise to appear, or (2) while on probation for conviction of a misdemeanor or motor vehicle violation, such person willfully fails to appear when legally called for any court hearing relating to a violation of such probation. (b) Failure to appear in the second degree is a class A misdemeanor.

miles. He was made to perform this drive four times total because of the defendants' decision to lay phony charges on him.

The defendants cite authority from outside the *Second District Nieves v. McSweeney*, 241 F.3d 46, 56 (1st Cir. 2001) in opposition to that authority they cite within it which weighs in favor of it (*Rohman v. New York City Transit Authority*, 215 F.3d 208, 215-18 (2d Cir. 2000)) illustrating that within this District, the Plaintiff's alleged injuries, the facts presented, and the local case law all factor in favor of liability on the defendant's part for Fourth Amendment malicious prosecution liability. The defendants essentially take the position that once they released Mr. Picard from custody whatever happened to him at court was someone else's problem. This is a lot like the arsonist lighting a match and blaming the barn for burning, or the farmer or the volunteer fire department for not being able to put it out quicker.

In any event, this strike-the-match-and-blame-the-barn approach to severing officer liability for liberty deprivation by the "intervening cause" of prosecution was addressed in *Dufort v. City of New York*, 874 F.3d 338 (2017) where investigating officers knowingly concealed flimsy line-up identifications from the prosecutors, who took them at face value and secured an indictment. The defendants here expected the prosecutor to take their allegations at face value. There is no recording, transcript or known notes as to the specifics of the Colangelo-Fontneau phone call but the *jist* of that conversation can be understood to be that Colangelo told Fontneau he could only arrest the protester *if* he does x-y-z and it is "documented", after which the defendants arrested the protester, and then "documented" that he did X-Y-Z, simply claiming it was so in their report. In the alternate, defendant Bretthauer convinced defendant Fontneau

15

that X-Y-Z had been done, and then Fontneau took her word for it and initiated an arrest, then defendant McGowan did the false documenting.

Either one of two possibilities has to be true. Either a. John Fontneau arrested Mr. Picard knowing that Michael had done nothing wrong and the police report simply reflects that which the prosecutor had just told Fontneua that Picard would have had to do to justify an arrested, in which case Bretthauer and McGowan are guilty of helping to try to conceal the bad arrest with claims they saw Picard behaving so, which they do in the police report and in their depositions; or else Bretthauer and McGowan convinced Fontneau to arrest an innocent person and Fontneau went along with it without making any effort to independently verify their claims about his conduct -perhaps because he was already set to retire and had "nothing to lose?" [17] "Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury. *Dufort v. City of New York*, 874 F.3d 338 (2017) citing *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). Whether defendant Fontneau knew that Mr. Picard wasn't engaged in any behavior that would warrant his arrest, whether Bretthauer's reports included information that he was, whether Fontneau or Bretthauer knew that the police report was fabricated, and whether and to what extent defendants Fontneau, Bretthauer and McGowan endeavored separately, or engaged together in a conspiracy, to frame Mr. Picard are unresolved issues for the jury to decide.

---

17 Fontneau in his affidavit, attached to defendants motion for summary judgment, attempts to explain his "mistake" in his deposition testimony where he claimed to have called SA Colengelo's desk line from his own desk line after looking for the number he had written down somehere. In reality, Fontneau used his own personal cell phone to call the personal cell phone of SA Colangelo. Another "mistake" Fontneau made was in his deposition claiming to have made his decision to retire some time *after* having arrested Mr. Picard on April 26, 2018. In reality, Fontneau tendered his retirement letter in February of 2016 (See Exhibit 6) more than two years before arresting Picard, suggesting that on the day he did so he was "already on his way out" anyway.

**3.1. The defendant's are not entitled to a qualified immunity defense given the allegations and evidence against them that they framed an innocent man for a crime they knew he did not commit.**

"Qualified immunity law does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. Rensselaer County*, 882 F.3d 58, 69 (2d Cir. 2018). This is because litigation over the most obvious instances of patently unconstitutional behavior tends not to occur, and there is no judicial need to state what is plain. "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances." *K.H. v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990). The same is true here. Because the defendants fabricated the allegations against the Plaintiff (Bretthauer and McGowan), and/or made no effort to verify they were true or else acted knowing they were false (Fontneau) they did did not have probable cause or arguable probable cause to arrest Picard and none of them are entitled to qualified immunity on any claims, including malicious prosecution.

**3.2. Mr. Picard was seized when he appeared at a post-arraignment hearing that his conditions of release obligated him to attend.**

Defendants contest whether Mr. Picard was seized for purposes of a Fourth Amendment malicious prosecution claim. Picard was arrested and released on a promise to appear. He was then subject to prosecution if he failed to attend,[18] and in

---

18 *See* Conn. Gen. Stat. Ann. § 53a-173(a) (forbidding anyone to "willfully fail[] to appear when legally called according to the terms of such person's . . . promise to appear" for the period during which the person is "charged with the commission  of a misdemeanor" and has been released "on bail or . . . under other procedure of law").

fact attended, multiple hearings in his criminal case. That comprises a seizure, and so defendants are not entitled to judgment on Plaintiff's malicious prosecution count.

Our court of appeals has "consistently held that a post-arraignment defendant who is obligated to appear in court in connection with [criminal] charges *whenever his attendance [i]s required* suffers a Fourth Amendment deprivation of liberty" for purposes of a malicious prosecution claim. *Swartz v. Insogna*, 704 F.3d 105, 108, 112 (2d Cir. 2013) (emphasis added) (reversing grant of summary judgment to defendant on malicious prosecution). This Court and others in this circuit read *Swartz* to obviate any arguments about a minimum level of seizures for malicious prosecution: one court appearance suffices so long as the plaintiff was compelled by law to attend it. *E.g., Goff*, 2017 WL 2174404, at *13 (citing *Swartz* and holding seizure element was met where plaintiff was released on bond and "required to appear in court once in connection with the charge against him before the charge was nolled"); *see also Gogol v. City of New York*, No. 15-cv-5703, 2017 WL 3449352, at ** 2, 11 (S.D.N.Y. Aug. 10, 2017) (citing *Swartz* and denying summary judgment on malicious prosecution as to the seizure where plaintiff was required to attend one hearing following arraignment); *Willis v. City of New York*, No. 12-cv-5259, 2015 WL 556884, at *8 (S.D.N.Y. Feb. 9, 2015) (citing *Swartz* and explaining that, where a plaintiff "was required to appear . . . at his initial arraignment and at the later hearing date," summary judgment for the defendant on the issue of seizure would be inappropriate); *Peterec v. Hilliard*, No. 12-cv-3944, 2013 WL 5178328, at *9 (S.D.N.Y. Sep. 16, 2013) (same, and denying summary judgment where plaintiff was required to make one post-arraignment appearance).

Here the arrest, baseless criminal charge, and conditions of release obligated Mr. Picard to obey the Connecticut Superior Court's hearing dates. Not being free to be

physically present anywhere other than in front of the superior court when it twice commanded his presence, Mr. Picard was seized. "[U]nder the circumstances, a reasonable person" would not have believed themselves free to ignore the court's call. *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996). *See Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (defining a seizure as occurring upon "a governmental termination of freedom of movement through means intentionally applied"). Defendants' motion must be denied.

**4. Conclusion**

All of the evidence the defendants' use to support their motion for summary judgment is testimonial evidence created well after-the-fact by the defendants themselves and their colleagues months after the arrest was made and the basis of the Plainitff's claims was already known to them. All of *that* evidence flies in the face of the hard evidence that the defendants and their colleagues could not erase, re-write or otherwise manipulate: the videos of the Plaintiff's protest, Fontneau's ultimatum and words to the press after the arrest, the contents of the police report, and the fact that none of the defendants nor any of their colleagues made any effort to record the alleged illegal conduct by photograph, or with video or by recording the names or statements of *any* of the alleged victims of the Plaintiff's beach of peace. Because of these sharp discrepancies and the defendants inability to point to even a single piece of hard evidence in their favor and because "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... [when] he is ruling on a motion for summary judgment[19]" the

---

19 *Dufort v. City of New York, 874 F.3d 338, 349-50 (2017) citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

defendants have failed both to prove that their interruption of Mr. Picard's speech was constitutional or to demonstrate that charging Picard with breach of peace for peaceable speech was permissible. They are not entitled to summary judgment on the amended complaint.

   Respectfully submitted,


   /s/ Joseph R. Sastre (CT 429450)
Joseph R. Sastre
Law Office of Joseph R. Sastre, LLC
852 Plainville Avenue
Farmington, CT 06032
(203) 530-8367
joseph.sastre@gmail.com

**Plaintiff's D. Conn. Local R. 56(a)(2) Responses To Defendant's Statement of Facts has been filed separately as Exhibit 22.**

**The Plaintiff Submits the following additional facts in opposition to the Defendants' Motion For Summary Judgment**

1. Defendant Bretthauer can be seen on Mr. Picard's body camera footage standing by and observing him nearly the entire time he is in front of the police station. *See Picard Body Camera video, Exhibit 1 and Exhibit 15, photograph from Fontneau deposition identifying Bretthauer from still frame of Picard's video (Exhibit 1).*

2. Bretthauer understood the meaning of Mr. Picard's sign enough to relate it back to the Mike Friend arrest, which in fact was the subject of Mr. Picard's speech. *See Bretthauer Deposition Exhibit 4, at 32:23-25 – 33:1-6.*

3. No recording or transcript of the pre-arrest, Fontneau-Colangelo phone call exists and the two give conflicting testimony about exactly what was said during it, including the contents of Picard's sign. Fontneau, in his deposition, does not recall telling SA Colangelo *any* specific allegations of conduct except to tell him that there was a guy with a sign out front that said something in the nature of "Fuck free speech" and Colangelo telling him to arrest him for it. *See Fontneau Deposition Exhibit 8 at page 51:16 through 52:3.* Then, in his deposition, SA Colangelo denies believing that holding a sign that says "Fuck" on it constituted grounds for arrest and denies advising Fontneau that it would be grounds for a legitimate arrest either although he could not recall either exactly what, if anything, he was told of Mr. Picard's conduct, he vaguely recounts elements of it and that Fontneau told him that the sign said something along the lines of "fuck the Stamford police." *See Colangelo Deposition Exhibit 9 at 19:9-24.*

4. SA Colangelo, obviously not present to see Mr. Picard or witness his conduct, left
   both the decision whether to arrest and the responsibility to verify and adequately
   "document" the alleged conduct with the arresting officers. *See Fontneau
   Deposition Exhibit 8 at 32:10-13 and Colangelo Deposition Exhibit 9 at 22:2-7.*

5. Whatever his understanding of Mr. Picard's sign, Fontneau was offended by it,
   telling reporter John Nickerson of the Stamford Advocate, later the same day as
   the arrest, that: "I found the sign to be offensive in front of police headquarters as
   people are coming in and out," and "I don't think our day-to-day residents should
   have to put up with something like that." Fontneau does not claim to have
   reported any conduct, other than the holding of the sign, to the Stamford
   Advocate reporter. *See Exhibit 3, Stamford Advocate article dated April 27, 2018
   and Fontneau Deposition Exhibit 8 at 64:21 through 65:9.*

5A. Mr. Picard's sign was seized because it had the word "fuck" written on it, in the
    belief that it therefore served as evidence of a breach of peace. *See McGowan
    deposition transcript Exhibit 18 at 38:14 through 39-1.*

6. Seconds after emerging from the public entrance of the police station Fontneau
   confronted Mr. Picard and immediately issued him a clear and unambiguous
   ultimatum: that he was to either take down his sign or else be arrested. *See
   Picard Body Camera video, Exhibit 1.*

7. Fontneau's ultimatum included no other order. He did not tell Picard to move. He
   did not tell Picard to stop blocking foot traffic. He did not tell Mr. Picard to stop
   shouting at people, or to stop jumping out in front of people. He did not indicate in
   any way that Picard had been hassling passers-by, only that he had to take down
   his sign. *See Picard Body Camera video, Exhibit 1.*

8.  Fontneau made good on his ultimatum, arresting Mr. Picard and confiscating his sign, ending Picard's protest, silenced his speech and initiating a criminal prosecution against Mr. Picard. *See Picard Body Camera video, Exhibit 1.*

9.  Fontneau arrested Mr. Picard without making any attempt to verify whether he was engaging in any unlawful behavior, or for that matter any behavior at all aside from displaying his sign which he saw as he approached Mr. Picard. *See Fontneau Deposition Exhibit 8 at 55:25 through 56:23*.

10. Bretthauer testified that she expects an officer's word that something happened to be *as good as a video of it happening. See Bretthauer Deposition Exhibit 4 at 28:4-14, 30:7-25 and 31:1-3.*

11. The allegations in the police report do not match what is seen in the videos of the events and in fact, never occurred. Not only is there no hassling type conduct seen in the videos, no victim of any such conduct is identified in the police report. *See police report narrative page Exhibit 10 and contrast with Plaintiff's video, Exhibit 1 and witness Ortiz's video Exhibit 2.*

12. McGowan admits that the conduct described as "blocking" pedestrians was really nothing more than Mr. Picard turning his sign towards them so they can read it and that to the extent that he saw anyone "blocked" by Mr. Picard they merely stepped around him onto the public parking area. *See McGowan Deposition Exhibit 18 at 33:16-23, 40:11-15.*

13. The police report *also* materially misrepresents Fontneau's ultimatum, changing it from an order to take down the sign, to one to change locations. *See police report narrative page Exhibit 10 and contrast with Plaintiff's video, Exhibit 1*

14. McGowan testified that he and Bretthauer stood together in the parking lot conversing about how the situation would be handled. *See McGowan Deposition Exhibit 18 at 26:16-23.*

15. McGowan testified that Bretthauer ordered Bossone to write the report and that he and Bretthauer told Bossone what to write *in* the report. *See McGowan Deposition Exhibit 18 at 13:22 through 14:7, 16:5-13 and 30:16-19.*

16. McGowan admits participating in the session in which Bossone was informed what happened and McGowan signed off on the report as the supervisor, thereby ratifying the report. *See police report first page bottom Exhibit 10 and McGowan deposition transcript Exhibit 18 at 16:22-17:15, 19:16-18.*

17. It is unlikely that Fontneau knew that Mr. Picard was recording the ultimatum because Bretthauer had not noticed the body camera until the moment of Mr. Picard's arrest, and she is said to be the one to have informed Fontneau. *See Bretthauer Deposition Exhibit 4, at 26:14-18.*

18. No police officer made any effort to identify Mr. Picard's friend David Ortiz or ask for a copy of the video he was making. Such a witness, or video, would have been excellent evidence had the hassling type conduct really happened, which would have obviated the need to record the identity of any victim for proprietorial purposes. See *McGowan deposition transcript Exhibit 18 at 36:12 through 37-9.*

19. No police officer made a record Mr. Picard's alleged conduct by photograph, video or otherwise, although several were present and likely in possession of smart phones suggesting that there was simply no such conduct to document.

20. Police officer Bossone testified that McGowan was the true author of the police report and told him what to write in it. This officer did not witness any of the

activity described and simply wrote what McGowan told him to write. *See Bossone Deposition Exhibit 11 at 9:17-23.*

21. Mr. Picard's presence outside the police station was dealt with, according to Susan Bretthauer, "by the department, as a whole" suggesting with those words that there was discussion and agreement on how it would be handled. *See Bretthauer Deposition Exhibit 4 at 34:9-15.*

22. All police officers known or believed to have possibly witnessed the Plaintiff's activities of April 26, 2018 had their depositions taken, and none except McGowan and Bretthauer claim to have have personally witnessed any hassling type activity, however phrased or described.

23. Fontneau admits that, in retrospect, he would not repeat the arrest, nor would he expect another officer faced with the same situation to make an arrest under the same circumstances and that an officer making such an arrest would be acting contrary to the law.

    *See Fontneau Deposition Exhibit 8 at 44:24-25 through 45:1-20.*

24. At his deposition Fontneau claimed to have made the decision to retire some time *after* Mr. Picard's arrest, but a document obtained through the Freedom of Information Act that shows he had in fact had already tendered his retirement lover two years *before* arresting the Plaintiff. *See Exhibit 6 Fontneau Retirement Letter and Fontneau deposition Exhibit 8 at 11:15 through 12:1.*

25. Colangelo claims never to have watched Mr. Picard's body camera footage, but in his deposition explains that S.A. Steve Weiss could have watched it, and that Weiss reported to him that efforts by "an investigator" to "find a witness" were futile. *See Colangelo Deposition Exhibit 9 at 24:1-20.*

26. Documents pertaining to the criminal court process show that on May 22, 2018 SA Weiss ordered the Stamford Police to copy and transmit to him Mr. Picard's body camera footage in advance of the July 5, 2018 court date, whereat Weiss dropped the charges. *See Exhibit 7 Court Document pertaining to order by SA Weiss for Stamford PD to copy and transmit video to him.*

27. Colangelo recalls hearing from Assistant Chief James Methany, sometime after the arrest, that Fontneau was going to arrest Mr. Picard even if Colangelo advised against it. *See Colangelo Deposition Exhibit 9 at 25:7-25.*

28. Metheny can be seen as present for Mr. Picard's arrest on Mr. Picard's body camera video. He was identified on a still photograph from the video by Fontneau. *See Exhibit 17, photograph from Fontneau deposition (still frame from Plaintiff's Exhibit 1 video) and compare to news article identifying Metheny.*

29. On April 26, 2018 Mr. Picard was released from the custody of the Stamford Police, post arrest, at around noon after posting a cash bond. He received a notice advising him of his obligation to appear at court on May 10, 2018 and also advising him the penalty for failing to appear thereat. *See Exhibit 19 Picard Bail Notice.*

30. Mr. Picard had three court dates in the Stamford criminal court. The first appearing on the arraignment docket on May 10, 2018, then on the pretrial docket on May 21, 2018, and the third on the regular docket on July 5, 2018 at which time the charges against Mr. Picard were dropped and dismissed. *See Exhibits 12, 13 and 14, transcripts of Plaintiff's criminal court appearances.*

31. The distance between the criminal courthouse at 123 Hoyt Street in Stamford, Connecticut and Mr. Picard's home South Windsor, CT is 84.8 miles. *See Exhibit 21, Picard Declaration.*

32. The sidewalk along Hoyt Street and the sidewalk that runs past the police station are connected, with no visible difference between them. There are no signs or gates that one passes restricting access to the sidewalk, nor are there any signs posted on the front of the police station. The defendants do not allege that any exist either. *See Exhibit 1 (video), Exhibit 20 photos, and Exhibit 21 Picard declaration.*

33. The sidewalk in front of the Stamford Police Department upon which Mr. Picard stood was more than 70 inches wide and abuts a large public paring area. The stairs headed from that sidewalk up to the front doors of the police station are separated into three sections between several pillars. Each of these three sections is greater than 88 inches wide, and a ramp runs up to the doors from the sidewalk from the left hand side of the stairs. *See Exhibit 21, Picard Declaration and Exhibit 20 photos of sidewalk and front of Stamford Police Station.*

### Certificate of Service

I certify that a copy of foregoing was filed electronically on the date stamped on it by the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through CM/ECF.

 **/s/  Joseph Sastre**